**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

KAMRON K. WILSON, et al.,

        Plaintiffs,

vs.

HARBOR FREIGHT TOOLS USA,
INC.,

        Defendant.

No.  23-CV-1007-KEM

**MEMORANDUM OPINION
AND ORDER**

---

## *TABLE OF CONTENTS*

I.    **BACKGROUND** ................................................................................ 2

II.   **DISCUSSION** ................................................................................. 3

  A.    **Statutory Immunity from Design-Defect and Implied-Warranty Claims** ....... 4

    1.   **Whether Statutory Immunity Under § 613.18(1)(a) Applies to Design-Defect Claims Post-Wright** ................................................................... 5

    2.   **Whether Harbor Freight is the "Designer" or "Apparent Manufacturer" of the Winch for Purposes of Statutory Immunity on the Breach of Implied Warranty of Merchantability Claim** ....................................................... 18

  B.    **Failure-to-Warn Claim** ................................................................ 24

  C.    **Assumption-of-Risk Defense** ......................................................... 30

  D.    **Express-Warranty Claim** .............................................................. 31

  E.    **Emotional-Distress Claim** ............................................................. 33

    1.   **Sensory and Contemporaneous Observance of the Accident Element** ...... 34

    2.   **Seriousness of Emotional Distress Element** ................................... 37

**F.**  **Loss-of-Consortium Claim** ............................................................. 38

**G.**  **Punitive Damages** .................................................................... 38

**III.**  **CONCLUSION** .......................................................................... 40

Defendant Harbor Freight Tools USA, Inc., moves for summary judgment on all claims in this products-liability case.  Doc. 30.  Harbor Freight argues that statutory immunity under Iowa Code § 613.18(1)(a) applies to post-*Wright* design-defect claims; that it is neither the designer nor apparent manufacturer for purposes of the immunity statute; that it provided adequate warnings, that the danger was obvious, and that any failure to warn did not cause the injury; that the "assumption of risk" doctrine applies as a matter of law; that an express warranty related to "material and workmanship" and "quality and durability" does not warrant against design defects; that Plaintiffs cannot prove a sensory and contemporaneous observation of the accident and serious emotional distress as required for a bystander emotional-distress claim; and that Plaintiffs cannot prove Harbor Freight acted willfully and wantonly for purposes of punitive damages.  I **grant in part and deny in part**:  I grant summary judgment on Plaintiffs' claims for express and implied warranty, bystander emotional distress, and punitive damages; I deny summary judgment on Plaintiffs' claims for design defect, failure to warn, and loss of consortium.

## I.  BACKGROUND[1]

Plaintiff Kamron Wilson had his finger amputated after an accident on March 6, 2021, in which his finger became entangled in a winch on his ATV.[2]  *See* Def. App. 63-

---

[1]  Facts without a citation throughout this opinion are taken from Defendant's Statement of Facts admitted by Plaintiffs in their response thereto (Docs. 30-1, 40-1); and Plaintiffs' Statement of Facts admitted by Defendant in its response thereto (Docs. 40-2, 46-1).

[2]  All-Terrain Vehicle.

68.[3]  Wilson[4] had placed his fingers on the winch's hook (he had misplaced the safety strap), and his fingers were pulled into the rollers when he tried to extend the winch.  *Id.* Wilson had purchased the winch, a Badland Winch 2500 LB Capacity ATV/UTV Winch (model number 61297), from a Harbor Freight store about a year and a half earlier and used it without issue before the accident.  He alleges claims against Harbor Freight for design defect, failure to warn, breach of express warranty, and breach of the implied warranty of merchantability, and his wife Christine Wilson alleges infliction of emotional distress and loss of consortium.  Doc. 18.  Plaintiffs also seek punitive damages.  *Id.*

Harbor Freight moves for summary judgment on all claims.  Docs. 30, 34. Plaintiffs filed a resistance (Doc. 40), and Harbor Freight filed a reply (Doc. 47).  The parties consented to the exercise of jurisdiction by a United States magistrate judge, and the case was assigned to me for final disposition.  Docs. 10, 12.

## II.    DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  For a plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff."[5]  The court "view[s] the record in the light most

---

[3]  "Def. App." refers to Defendant Harbor Freight's Appendix (Docs. 30-2 to 30-7).  "Pl. App." refers to Plaintiffs' Appendix (Doc. 40-3).  Defendant also submitted a Supplemental Appendix consisting of cases (Docs. 46-3 to 46-5).

[4]  Wilson (singular) refers to Plaintiff Kamron Wilson.  I refer to Plaintiff Christine Wilson by her first name to avoid confusion.

[5]  *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

3

favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor."[6]

This diversity action involves claims under Iowa state law. Federal courts are "bound by the decisions of the [Iowa] Supreme Court regarding issues of substantive state law."[7] "If the [Iowa] Supreme Court has not yet addressed a particular issue, '[the court] may consider relevant state precedent, analogous decisions, considered dicta, and any other reliable data.'"[8] "Decisions from [Iowa's] intermediate appellate court . . . are 'particularly relevant,' and must be followed when they are the best evidence of [Iowa] law."[9]

### A. Statutory Immunity from Design-Defect and Implied-Warranty Claims

Harbor Freight argues that it is statutorily immune from liability for Wilson's design-defect and implied-warranty claims, as it did not design or manufacture the winch. Iowa Code § 613.18(1)(a) provides:

> A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is . . . [i]mmune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product.

Plaintiffs respond the immunity statute does not apply to design-defect claims sounding in negligence. They admit the implied-warranty claim is based on the implied warranty of merchantability (addressed in the statute) but argue there is a genuine dispute of material fact whether Harbor Freight designed the winch or is the "apparent

---

[6] *Soo Line R.R. Co. v. WernerEnters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

[7] *Bockelman v. MCI Worldcom, Inc.*, 403 F.3d 528, 531 (8th Cir. 2005).

[8] *Id.* (cleaned up) (quoting *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 846-47 (8th Cir. 1998)).

[9] *Id.* (quoting *Knouse v. Gen Am. Life. Ins. Co.*, 391 F.3d 907, 911-12 (8th Cir. 2004)).

4

manufacturer," and that Harbor Freight is therefore not entitled to immunity on the implied warranty claim.

### 1. Whether Statutory Immunity Under § 613.18(1)(a) Applies to Design-Defect Claims Post-*Wright*

This appears to be an issue that has not yet been addressed by either Iowa or federal courts. To understand the parties' arguments, a history of products-liability claims in Iowa is required. Iowa courts have largely followed the Restatements, adopting new Restatements shortly after they are published. The Iowa Supreme Court first recognized strict liability for products claims in 1970, following the Restatement (Second) of Torts (first published in 1965).[10] Under the Restatement Second, strict liability required proof that the defendant sold the "product in a defective condition unreasonably dangerous to the user or consumer."[11] A strict-liability claim could be brought against any seller in the line of distribution, the "retailer as well as the manufacturer of [the] defective product."[12] It could be based on a defect in the product's manufacture, design, or warnings.

A plaintiff could also still proceed on a negligence theory.[13] Both the Restatement (First) of Torts (published in 1934) and Restatement Second provide that the manufacturer of a dangerous product is liable for a failure to exercise "reasonable care" in the product's

---

[10] ***Wright v. Brooke Grp. Ltd.***, 652 N.W.2d 159, 164 (Iowa 2002) (citing ***Hawkeye-Sec. Ins. Co. v. Ford Motor Co.***, 174 N.W.2d 672, 684 (Iowa 1970)).

[11] ***Id.***

[12] ***Kleve v. Gen. Motors Corp.***, 210 N.W.2d 568, 571 (Iowa 1973).

[13] ***Wright***, 652 N.W.2d at 164.

5

manufacture and design; numerous Iowa cases recognized this principle.[14]    A nonmanufacturing seller that held itself out as the manufacturer of a defective product was held to this "reasonable care" standard under the "apparent manufacturer doctrine" (recognized by both the Restatement First and Restatement Second and three Iowa Supreme Court cases from the 1960s).[15]   In addition, any nonmanufacturing seller could be liable in negligence if it "knew or had a reason to know" about the product's

---

[14]  **Restatement First § 395 & cmt. c.** (1934); *accord* **Restatement Second §§ 395, 398** (1965). For an example of Iowa cases recognizing this standard, see *Chown v. USM Corp.*, 297 N.W.2d 218, 220 (Iowa 1980); and *Bengford v. Carlem Corp.*, 156 N.W.2d 855, 864 (Iowa 1968).

[15]  **Restatement First § 400**; **Restatement Second § 400**; *Tice v. Wilmington Chem. Corp.*, 141 N.W.2d 616, 628 (Iowa 1966) (recognizing that "one who puts out as his own a chattel manufactured by another is subject to the same liability as though he had in fact manufactured the product" and holding doctrine applied when defective product "was custom compounded for [defendant] by another company in accord with defendant's directions, using component parts ordered by it; packaged in containers with labels supplied by defendant; then warehoused and shipped to purchasers in accord with defendant's shipping orders"), *supplemented,* 143 N.W.2d 86 (Iowa 1966); *Wagner v. Larson*, 136 N.W.2d 312, 325 (Iowa 1965) (jury question existed on defendant seller's negligence in failing to include a safety device on a piece of farm equipment that would have prevented the plaintiff's accident and in failing to advise buyer of the safety device's availability, as defendant "placed itself in the position of the manufacturer" by requiring the manufacturer to obtain approval from the defendant's engineering department for any changes to the product's design, suggesting "implicit" approval of the design; defendant advertised and sold the product under defendant's trade name and with defendant's "serial number plates, decals and paint specifications"; and there was evidence of "the purchaser's reliance on the [defendant] when the machine was purchased"); *Rauch v. Am. Radiator & Standard Sanitary Corp.*, 104 N.W.2d 607, 610-13 (Iowa 1960) (citing Restatement on apparent-manufacturer doctrine and holding defendant's sale of replacement part for its product under its trade name, which in combination with reason to know of danger, created "a duty to inspect the" replacement part designed and manufactured by another, and defendant's "failure to discover and correct or warn against the defective [replacement part] amounted to actionable negligence").

6

dangerousness,[16] although as the Iowa Supreme Court recognized, this might be hard to prove.[17]

The Iowa Supreme Court described the difference (in theory) between strict liability and negligence claims as follows:

> The essential difference between an action in negligence and one in strict liability . . . lies not in the condition of the product but in the requirement in the negligence action of additional proof regarding the nature of the defendant's conduct. In the negligence action, not only must the product itself be found actionable, but the defendant must also be found negligent in letting the product get into that dangerous condition, or in failing to

---

[16] **Restatement First §§ 389, 399**; **Restatement Second §§ 389, 399**; *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 946-47 (8th Cir. 1998) (applying Iowa law) (upholding dismissal of negligent manufacturing, testing, and inspection claim against distributor of product manufactured with faulty safety valve, since defendant received the product "in a sealed box and did not open the box before reshipping" it, defendant did not design or manufacture the product, and no evidence suggested defendant "knew or had reason to know" of product's dangerousness); *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854, 864 (Iowa 1994) (holding that asbestos suppliers were not liable in negligence for the injuries caused by plaintiff's exposure to asbestos—nor were they required "to inspect or test a product for danger"—since there was no evidence the suppliers "knew or had reason to know of the dangers"); *Wagner*, 136 N.W.2d at 325-26 (in addition to being apparent manufacturer, evidence of "complaints about danger to [defendant]" supported nonmanufacturing distributor had "reason to know" of product's danger); *Rauch*, 104 N.W.2d at 613 (holding the manufacturer of a product could be held liable in negligence for a defect in a replacement part manufactured by another company, since in addition to being apparent manufacturer, defendant knew "of dangers inherent in defective [replacement parts]," since as part of using the parts in its original design, defendant tested them before and after installation—but did not test the parts sold as replacements at all).

[17] The court stated:
> "Design negligence is particularly an area in which it seems difficult ordinarily to find any logical basis for imposing liability upon the retailer in negligence, because design certainly in most instances involves questions of specialized knowledge which the retailer cannot be expected to have. Of course, there can be instances where the design is so obviously hazardous that this should be apparent to the retailer. Or, the retailer, for example, by reason of demonstrating the product, may discover that the design is hazardous. Of course, the retailer may be held liable for design negligence, where the design is one devised by him or represented by him to be proper for a particular type of use."

*Wagner*, 136 N.W.2d at 325 (cleaned up) (quoting **Frumer & Friedman**, *Products Liability* § 18.04).

7

discover the condition and take reasonable action to eliminate it. In strict liability, this is not required; all that the plaintiff must do is show that the product was in the dangerous condition when it left the defendant's control.[18]

A defendant could be liable in strict liability "even though he has exercised all possible care in the preparation and sale of the product."[19] Thus, "strict liability focuse[d] on the condition of the product," while "negligence focuse[d] on the defendant's conduct."[20] Ultimately, however, in practice, the tests developed in Iowa for whether a product was "unreasonably dangerous" for purposes of strict liability required analyzing a consumer's expectations of dangerousness or balancing "the utility of the [product] against the risk of its use," which is "the same weighing process . . . used in a negligence case" to determine if a manufacturer exercised "reasonable care."[21]

In 1986, the Iowa legislature adopted the immunity statute (Iowa Code § 613.18), protecting nonmanufacturing sellers from design-defect and manufacturing-defect claims based on strict liability.[22] The statute provides immunity from such claims to sellers (including wholesalers, retailers, and distributors) who did not assemble, design, or manufacture the product.[23] The statute does not state that nonmanufacturing sellers are immune from *all* products claims based on a defect in a product's manufacture or design. As discussed earlier, at the time of the statute's adoption, the Iowa Supreme Court had recognized a nonmanufacturing seller could be held liable in negligence for failing to

---

[18] *Chown*, 297 N.W.2d at 220 (quoting **J. Wade**, *On Product "Design Defects" and Their Actionability*, 33 Vand. L. Rev. 551, 553 (1980)).

[19] ***Aller v. Rodgers Mach. Mfg. Co.***, 268 N.W.2d 830, 834 (Iowa 1978).

[20] *Wright*, 652 N.W.2d at 166.

[21] *Id.* at 165.

[22] **Iowa Code § 613.18(1)(a)**.

[23] *Id.*

8

exercise reasonable care in a product's design (under the "apparent manufacturer" doctrine) or if the seller had "reason to know" of the product's dangerousness—yet the statute does not immunize sellers from such claims.

The purpose of the immunity statue was "to ensure that only those who have something to do with the design or manufacture of the product are subject to strict liability."[24] As explained by then-District Judge Melloy:

> An "assembler" may make some mistake in assembling the product; a "designer" may develop an unreasonably dangerous design; and a "manufacturer" may do both. By contrast, a mere wholesaler, retailer, or distributor simply passes the product along to a purchaser, and lacks control over the design and assembly of the product. Section 613.18 represents a judgment by the Iowa legislature that strict liability for design or manufacturing defects should extend only to those who have some responsibility for the design or manufacture of a product.
>
> It follows that the kind of strict liability defect claim that can be brought against a defendant depends upon what responsibility that defendant had for [the] product at issue. If a defendant's only role in bringing the product to market was to assemble the product, only a manufacturing defect claim may be brought. If a defendant's only role was to design the product, only a design defect claim may be brought. If a defendant both designed and manufactured a product, then either a design defect or a manufacturing defect claim, or both, may be brought.[25]

In 1994, the Iowa Supreme Court officially recognized that the tests for strict liability and negligence were of little difference for failure-to-warn claims.[26] The court "discard[ed] the theory of strict liability in failure-to-warn cases," holding "that such claims should be submitted under a theory of negligence only."[27] Then, in 2002, in

---

[24] ***Stoffel v. Thermogas Co.***, 998 F. Supp. 1021, 1033 (N.D. Iowa 1997); *accord* ***Housley v. Orteck Int'l, Inc.***, 488 F. Supp. 2d 819, 831-32 (S.D. Iowa 2007).

[25] ***Stoffel***, 998 F. Supp. at 1033.

[26] ***Wright***, 652 N.W.2d at 166 (citing ***Olson v. Prosoco***, 522 N.W.2d 284 (Iowa 1994)).

[27] ***Id.*** at 166.

9

*Wright v. Brooke Group Ltd.*, the Iowa Supreme Court similarly recognized "no real difference between strict liability and negligence principles" in design-defect cases.[28] The court adopted the Restatement (Third) of Torts: Products Liability, which had been published in 1998, and which recognizes "that strict liability is appropriate in manufacturing defect cases, but negligence principles are more suitable for other defective product cases" (such as design-defect cases).[29] After recognizing that the consumer expectation test historically used in design-defect cases involved "the same weighing process as that used in a negligence case," the court explained its "dissatisfaction" with that test because "in reality [it] does little to distinguish strict liability from ordinary negligence."[30] The court, like the Restatement Third, rejected "the consumer expectation test traditionally used in the strict liability analysis and adopted a risk-utility analysis traditionally found in the negligence standard."[31] The Iowa Supreme Court held a trial court "should not submit both a negligence claim and a strict liability claim based on the same design defect since both claims rest on an identical risk-utility evaluation."[32] Instead, one claim should be submitted, labeled "a design defect claim without reference to strict liability or negligence."[33]

The court ultimately held (as set forth in the Restatement Third) a seller of a defective product is liable for design defects when "the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributer, or a predecessor in the commercial

---

[28] *Id.* at 167.

[29] *Id.* at 168-69.

[30] *Id.* at 165, 167.

[31] *Id.* at 169 (quoting *Lovick v. Wil-Rich*, 588 N.W.2d 688, 698 (Iowa 1999)).

[32] *Id.*

[33] *Id.*

chain of distribution, and the omission of the alternative design renders the product not reasonably safe."[34]  Thus, the Iowa Model Jury Instructions for a design-defect claim post-*Wright* provide the following elements:

1. The defendant sold or distributed the (product);
2. The defendant was engaged in the business of selling or distributing the (product);
3. The product was in a defective condition at the time it left defendant's control, in one or more of the following ways:  (Set out particulars as supported by the evidence.)
4. A reasonable alternative safer design could have been practically adopted at the time of sale or distribution.
5. The alternative design would have reduced or avoided the foreseeable risks of harm posed by the (product);
6. The omission of the alternative design renders the (product) not reasonably safe;
7. The alternative design would have reduced or prevented the plaintiff's harm;
8. The design defect was a cause of plaintiff's damage; and
9. The amount of damage.[35]

The court in *Wright* noted this test adopts negligence principles; it is essentially a "reasonable care" standard.[36]

The parties dispute whether statutory immunity applies to design-defect claims in the wake of *Wright*.  Specifically, they disagree whether post-*Wright*, design-defect claims are "based upon strict liability in tort . . . aris[ing] solely from an alleged defect in the original design . . . of the product."[37]  Although courts have assumed that statutory

---

[34]  *Id.* at 169 (quoting **Restatement Third § 2(b)**).

[35]  **Model Iowa Civil Jury Instructions § 1000.2** (2024).

[36]  *See* **Wright**, 652 N.W.2d at 168-69.

[37]  **Iowa Code § 613.18(1)(a)**.

immunity continues to apply to design-defect claims, no court has actually addressed the issue.[38]

Plaintiffs argue that after *Wright*, design-defect claims sound in negligence, not strict liability; thus, by its terms, statutory immunity does not apply. Plaintiffs note that although *Wright* stated it was not labeling design-defect claims as either "strict liability" or "negligence," it recognized the negligence principles underlying the elements of proof it set forth. Further, when the Iowa Supreme Court previously merged strict liability and negligence claims for failure-to-warn products claims, it specifically recognized such claims were negligence claims, not strict-liability claims.

---

[38] *See Merfeld v. Dometic Corp.*, 306 F. Supp. 3d 1070, 1077 n.5, 1082 (N.D. Iowa 2018) (granting summary judgment to defendants based on statutory immunity but "assum[ing] that the design defect claim plaintiffs assert in this case is subject to § 613.18(1)" when "the parties have not briefed the question" and instead focused on whether defendant qualified as an assembler, designer, or manufacturer under the statute), *aff'd*, 940 F.3d. 1017, 1019, 1020 n.4, 1022 (8th Cir. 2019) (affirming grant of summary judgment on negligent-design claim based on statutory immunity after noting the "statute applies to 'strict liability in tort' claims," *Wright* "eliminated the former distinction between strict liability and negligence claims in design defect cases," and the court "assume[d] the statute applies to a design defect claim under *Wright*" "[l]ike the parties and the district court"; also affirming that defendant was not manufacturer under immunity statute for purposes of negligent-manufacturing claim without discussing whether statute applied); *Allianz Glob. Corp. v. Watts Regul. Co.*, No. 4:14-CV-00253, 2016 WL 4435094, at *2, *4-5 (S.D. Iowa Apr. 7, 2016) (holding that genuine dispute of material fact existed whether defendant designed the product for purposes of statutory immunity and not grappling with whether statute applied to design-defect claims post-*Wright* when parties agreed to dismiss the negligence claim and proceed only on the "products liability claim"); *Anderson v. Kmart Corp.*, No. 4:13-cv-00216-RAW, 2014 WL 11514683, at *4 (S.D. Iowa Oct. 20, 2014) ("grant[ing] summary judgment on plaintiffs' claims of strict liability for design defect" based on statutory immunity without "decid[ing] whether design defect remains a strict liability claim after *Wright* for the purposes of § 613.18(1)" since "[t]he issue has not been briefed by the parties" (citation omitted)); *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr. Inc.*, 816 F. Supp. 2d 631, 643 (N.D. Iowa 2011) ("[Plaintiff] does not dispute the continued viability of § 613.18 . . . ."); *see also Frisch v. Shanghai Huayi Grp. Corp.*, No. 23-CV-15-CJW-KEM, 2023 WL 3480905, at *7 (N.D. Iowa May 16, 2023) (rejecting argument that defendant was fraudulently joined because of its entitlement to statutory immunity on negligent failure-to-warn-claim; the court noted the status of immunity was "ambiguous" after merger of negligence and strict-liability claims, as "the Iowa Supreme Court has not clarified the state of its immunity" and other courts had "assumed without deciding" the issue for design-defect claims).

12

Plaintiffs rely on the Iowa Supreme Court's post-*Wright* opinion in *Scott v. Dutton-Lainson Co.*[39]  In that case, the parties debated whether an Iowa Rule of Evidence adopted pre-*Wright* applied to design-defect claims post-*Wright*; the rule prohibited evidence of subsequent remedial measures "to prove negligence or culpable conduct," but by its terms, did not apply to evidence "offered in connection with a claim based on strict liability in tort."[40]  Like here, the parties disputed whether design-defect claims sounded in negligence or strict liability, since *Wright* rejected "categorical labels."[41]  The Iowa Supreme Court held that post-*Wright*, "design defect . . . claims are not strict liability claims."[42]  Thus, the court held inapplicable the rule of evidence's exception for strict-liability claims.[43]  Plaintiffs argue that just as a post-*Wright* design-defect claim is not a strict-liability claim for purposes of a rule of evidence, neither is it a strict-liability claim for purposes of the immunity statute.

Harbor Freight, on the other hand, focuses on the purpose of the immunity statute. Harbor Freight argues that because it did not design the winch, it cannot be liable for its defective design.  Harbor Freight suggests that the purpose of the immunity statute is to

---

[39]  774 N.W.2d 501 (Iowa 2009).

[40]  *Id.* at 504 (quoting **Iowa R. Evid. 5.407**).

[41]  *Id.*

[42]  *Id.* at 506.

[43]  *Id.* at 508.  In addition, in *Wurster v. Plastics Group, Inc.*, the Eighth Circuit held the district court did not abuse its discretion when it submitted plaintiff's design-defect claim to the jury using the general negligence marshaling instructions, rather than the Iowa model instruction specifically for design-defect claims.  917 F.3d 608, 614-15 (8th Cir. 2019).  The plaintiff had argued the court should give the model design-defect instruction only if it instructed on strict liability, which the Eighth Circuit held "was inconsistent with Iowa law."  *Id.* at 613, 615.  Relying on *Scott*, the Eighth Circuit noted "design defect claims [under Iowa law] are not strict liability claims."  *Id.* at 615.

13

protect sellers who have no control over a product's design from liability based on defects in that design—whether those claims sound in strict liability or negligence.

There is some general support for Harbor Freight's argument. Courts have interpreted the immunity statute more broadly than it is written based on its purpose. Courts (including the Iowa Supreme Court) have held that although § 613.18(1)(a) states it protects sellers who are "not the assembler, designer, or manufacturer," it also provides immunity to anyone whose involvement (even assembling, designing, or manufacturing) lacks a "causal connection to [the] dangerous condition in the product that gives rise to [the] strict-liability claim."[44] Indeed, even a defendant who contributed to a product's design may be entitled to statutory immunity on a strict-liability design-defect claim if the defendant's "design input" lacks "a causal connection . . . [to] the dangerous

---

[44] *Kolarik v. Cory Int'l Corp.*, 721 N.W.2d 159, 162 (Iowa 2006); *accord Merfeld*, 940 F.3d at 1021-22. The immunity statute provides:

> 1. A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product is:
>> a. Immune from any suit based upon strict liability in tort or breach of implied warranty of merchantability which arises solely from an alleged defect in the original design or manufacture of the product. . . .
> 2. A person who is a retailer of a product and who assembles a product, such assembly having no causal relationship to the injury from which the claim arises, is not liable for damages based upon strict liability in tort or breach of implied warranty of merchantability which arises from an alleged defect in the original design or manufacture of the product upon proof that the manufacturer is subject to the jurisdiction of the courts of this state and has not been judicially declared insolvent.

Iowa Code § 613.18. The Iowa Supreme Court's interpretation of § 613.18(1)(a) in *Kolarik* (requiring causation for an assembler, designer, or manufacturer to be liable) renders § 613.18(2) superfluous (requiring causation for an assembler to be liable, but only if jurisdiction exists over the solvent manufacturer). The Eighth Circuit has specifically rejected the argument that the Iowa Supreme Court's reasoning in *Kolarik* applies only to assemblers (under § 613.18(2)), noting the court in *Kolarik* specifically cited and discussed Iowa Code § 613.18(1) without mentioning § 613.18(2). *Merfeld*, 940 F.3d at 1022.

14

condition in the product" giving rise to the claim.[45]  For example, the Eighth Circuit has interpreted the immunity statute as protecting "a retail supplier of farm implements" who "requested the manufacturer to include an AM/FM radio in the cab" from "design liability for a defective tractor clutch"; and it protects an American refrigerator distributor who attended aesthetic design meetings and requested the manufacturer to comply with American safety standards, but whose "limited involvement in design-related activities" did not "relat[e] in any way to the boiler tubes" alleged to be defective.[46]

But courts have never interpreted the immunity statute so broadly that they have found the legislature intended to provide immunity for negligence claims.  The plain language of the immunity statute states it applies only to strict-liability claims.  The history shows instances in which mere sellers were liable in negligence at the time of the immunity statute's adoption, yet the legislature declined to provide immunity for such claims.  And although the test for strict liability looked close to the test for negligence almost from the beginning, it appears the legislature was concerned with protecting mere sellers under the traditional view of strict liability, which imposed liability for selling a defective product even if the manufacturer and seller exercised all possible care.

---

[45] *Merfeld*, 940 F.3d at 1022.

[46] *Id.* at 1021-22; *see also* *Kolarik*, 721 N.W.2d at 162 (even if defendant who bought pitted olives in bulk and repackaged into smaller containers was "assembler," immunity statute applied to strict-liability manufacturing-defect claim, because defendant's repackaging "did not contribute" to the defect of a pit being in the olives); *Stoffel v. Thermogas Co.*, 998 F. Supp. 1021, 1033 (N.D. Iowa 1997) (holding that when plaintiff claimed odorized propane was defectively designed because smell dissipated after an hour, despite the continued presence of gas, defendant that had odorized gas was entitled to statutory immunity, as it simply followed its customer's directions and was therefore not the "designer," and its status as an *assembler* could not subject it to a strict-liability *design* claim when there was no "defect in the manufacture or assembly" process).

15

Design-defect claims changed with the *Wright* decision. Like the Restatement Third, *Wright* seems to eliminate prior negligence claims[47] as well as strict-liability design-defect claims, leaving instead a single new "design defect" claim. Whether the immunity statute continues to apply comes down to whether the new post-*Wright* design-defect claim is based on negligence or strict liability.

*Wright* speaks in terms of products liability for *any* seller in the chain of distribution.[48] Unlike most pre-*Wright* design negligence claims, a post-*Wright* design-defect claim does not require proof that the defendant negligently designed the product; the defendant's liability is instead based on selling a defectively designed product. The comments to the Restatement Third recognize that "it is no defense that a nonmanufacturing seller of [a defective] product exercised due care"; "strict liability is imposed on a . . . retail seller who neither knew nor should have known of the relevant risks, nor was in a position to have taken action to avoid them, so long as a predecessor in the chain of distribution could have acted reasonably to avoid the risks."[49] A post-

---

[47] The Restatement Third (on which *Wright* relied) eliminated Restatement sections outlining negligent products claims based on a manufacturer's failure to exercise "reasonable care" or a seller's "reason to know" of a product's dangerousness. The "apparent manufacturer" doctrine remains in the Third Restatement, although the comments note the rule "is of little practical significance" since "nonmanufacturers in the chain of distribution are held to the same standards as manufacturers." **Restatement Third § 14 & cmt. b**.

[48] In *Egland v. Key Safety Systems, Inc.*, the district court held plaintiffs could not bring a "negligent design" claim against the defendant because "[p]laintiffs d[id] not allege that [defendant] designed the faulty seatbelt," but the court did not analyze the issue or recognize the language from *Wright* holding that liability rested on selling the defective product; the court held plaintiffs did state a colorable negligence claim against the "non-manufacturing supplier[]" based on a failure to test, inspect, or warn. No. 4:10-cv-219, 2010 WL 11469076, at *4 (S.D. Iowa July 30, 2010).

[49] **Restatement Third § 2, cmt. o**; *see also **Wright***, 652 N.W.2d at 168 (recognizing that under the Restatement Third, a "seller or other distributor, or a predecessor the commercial chain of distribution" may be liable).

*Wright* design-defect claim thus has similarities to a pre-immunity-statute strict-liability design-defect claim in that any seller may be liable for defects in the product.

A post-*Wright* design-defect claim differs, however, from traditional strict liability. The court in *Wright* examined and relied upon the Restatement Third's differing treatment of defective-product claims (specifically its "recognition that strict liability is appropriate in manufacturing cases, but negligence principles are more suitable for other defective product cases"). *Wright* created different standards consistent with that reasoning—traditional strict liability for manufacturing-defect claims[50] and a "reasonable alternative design" standard for design-defect and inadequate warning claims.[51]

When the defendant is a manufacturer or designer, there is no question that this standard renders a post-*Wright* design-defect claim closer to a negligence claim than a strict-liability claim (indeed, the court in *Wright* described the test as one sounding in negligence).[52] Also, as discussed above, there are pre-*Wright* equivalents to negligence claims against nonmanufacturing sellers (like claims based on the apparent manufacturer doctrine). The legislature's adoption of the immunity statute would not have impacted a plaintiff's ability to bring a *negligence* design-defect claim against an apparent manufacturer (only their ability to bring a *strict-liability* design-defect claim against an apparent manufacturer). To apply the immunity statute to design-defect claims post-*Wright* would eliminate a swath of claims in negligence that continued to exist after the

---

[50] A manufacturing defect means the product "departs from its intended design even though all possible care was exercised in the preparation and marketing of the product." ***Wright***, 652 N.W.2d at 168 (citing **Restatement Third § 2**, at 14).

[51] A design defect and warning defect are described the same way: "the foreseeable risks of harm posed by the product could have been reduced or avoided by" either "the adoption of a reasonable alternative design" for a design defect or "provision of reasonable instructions or warnings" for a warning defect, and that this omission "renders the product not reasonably safe." ***Wright***, 652 N.W.2d at 168 (quoting **Restatement Third § 2**).

[52] ***Wright***, 652 N.W.2d at 168.

17

legislature adopted § 613.18, providing a windfall to defendants. This seems inconsistent with the apparent intent of the legislature in passing the immunity statute, the language in *Wright* and the Restatement Third, and cases decided both before and after *Wright*.

I find this to be a close issue. Ultimately, however, I am guided by the plain language of the immunity statute and the Iowa Supreme Court's decision in *Scott*. By adopting the Restatement Third in *Wright*, the Iowa Supreme Court intended to change the legal landscape for design-defect claims.[53] Section 613.18(1)(a) states it protects against design-defect or manufacturing-defect claims "based upon strict liability in tort or breach of implied warranty of merchantability." The Iowa Supreme Court has recognized that a post-*Wright* design-defect claim relies on negligence principles, not strict liability. It has even held that a rule containing an exception for claims based on strict liability does not apply to post-*Wright* design-defect claims, as they are not strict-liability claims. By its terms, then, the immunity statute does not apply to Plaintiffs' design-defect claim here, which essentially requires proof that someone in the chain of distribution failed to exercise reasonable care, making it a negligence claim, not a strict-liability claim.

Because I find Iowa Code § 613.18(1)(a) does not apply to post-*Wright* design-defect claims, Harbor Freight is not entitled to summary judgment on Plaintiffs' design-defect claim based on statutory immunity.

### 2. Whether Harbor Freight is the "Designer" or "Apparent Manufacturer" of the Winch for Purposes of Statutory Immunity on the Breach of Implied Warranty of Merchantability Claim

Although I have found Harbor Freight cannot claim statutory immunity over Plaintiffs' design-defect claim, the statute unquestionably applies to claims for breach of

---

[53] Thus, I am not swayed by the fact that some defendant sellers may now be liable for design defects when previously, no negligence claim against them would have existed, and they would have been protected from a strict-liability claim based on the immunity statute.

the implied warranty of merchantability. The statute would not provide immunity, however, if Harbor Freight was the designer or manufacturer of the winch. Plaintiffs argue that there is a genuine dispute of material fact whether Harbor Freight designed the winch for purposes of the statute. A plaintiff bears the burden of proving statutory immunity does not apply and "must establish the seller is not in the [statute's] defined class of sellers immune from suit."[54]

Harbor Freight submitted a declaration from its Director of Quality Assurance stating that third party Ningbo Chima Winch Co., Ltd., not Harbor Freight, designed, assembled, and manufactured the winch at issue. Def. App. 396. Harbor Freight owns the trademark for "Badland Winches," the brand name for the winch. The owner's manual for the winch directs the purchaser to Harbor Freight's website, stating "visit our website at: www.harborfreight.com" and "[e]mail our technical support at: product support@harborfreight.com." Plaintiffs also rely on a printout of Harbor Freight's website from the Wayback Machine showing that "from at least November 27, 2020, through January 10, 2024," Harbor Freight's website stated:

**Where Are Badland Winches Made?**

Harbor Freight's Badland winches are designed in Calabasas, California at our state-of-the-art design center and built by our industry's leading manufacturers of tools. By searching worldwide, Harbor Freight is able to create relationships with some of the industry's leading manufacturers of tools. We work closely with each of our partners to ensure that all of our products are safe to use and will last our customers for years to come. In most cases these manufacturers are the same ones that produce products for other big name brands, but because we buy directly from them and sell directly to our customers, our prices are much more competitive.

**The Quality of Our Products**

It is important that all of our products, including Badland, offer more than just an incredible value, they must also be reliable and can stand up to our

---

[54] *Erickson v. Wright Welding Supply, Inc.*, 485 N.W.2d 82, 86 (Iowa 1992).

customers' needs. All of our Badland products are tested in quality assurance laboratories both in our partnered factories, as well as, our local California based facility and come backed by a 100% satisfaction guarantee.

Pl. App. 1, 8.[55]

Plaintiffs also argues there is a genuine dispute of material fact that Harbor Freight had a "reason to know" of the winch's defective design. Harbor Freight's Director of Quality Assurance declared (in March 2024) that "[i]n the last 5 years, Harbor Freight has not had any other claims that a customer sustained a similar injury to the one alleged by Plaintiff Kamron Wilson when using the" same model of Badland Winch as Wilson, despite selling 570,659 units from May 30, 2013, through February 1, 2024. Def. App. 396-97. In discovery responses (in March 2024), Harbor Freight also denied being a "party to any lawsuit, action, or claim of bodily injury involving" the model of Badland winch at issue here (model number 61297) within the last five years. Def. App. 383. Plaintiffs, however, point to a product-defect complaint Harbor Freight removed to

---

[55] I need not address whether the evidence Plaintiffs rely upon is properly authenticated and admissible (*see* LR 56(e)), since even considering it, I do not find that Plaintiffs have submitted sufficient evidence for a jury to find Harbor Freight designed the winch. I note that courts have split on whether the "online digital archive of web pages" collected by the nonprofit The Wayback Machine is a "source[] whose accuracy cannot reasonably be questioned" such that this evidence is self-authenticating and appropriate for judicial notice. *Compare, e.g.*, **Valve Corp. v. Ironburg Inventions Ltd.**, 8 F.4th 1364, 1374 (Fed. Cir. 2021) (collecting district court cases) ("District courts have taken judicial notice of the contents of webpages available through the Wayback Machine 'as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.' We agree." (citation omitted) (quoting **Erickson v. Neb. Mach. Co.**, No. 15-CV-01147-JD, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015))), **Valdez v. Scottsbluff Operations LLC**, No. 8:22-CV-289, 2024 WL 2092038, at *2 n.4 (D. Neb. May 9, 2024) (taking judicial notice of Wayback Machine content), *with* **Weinhoffer v. Davie Shoring, Inc.**, 23 F.4th 579, 584 (5th Cir. 2022) (holding that Wayback Machine content must be authenticated by "someone with personal knowledge of the reliability of the archive service").

federal court in October 2022 that involved the same model of Badland Winch as here.[56] Harbor Freight's motion for summary judgment in that case acknowledges that plaintiff's hand was pulled into the fairlead roller after grabbing the winch's hook and trying to extend the winch (which is similar to what Wilson alleged happened here).[57]  Plaintiffs also point to a lawsuit against Harbor Freight from early 2018, alleging the same model of winch as here failed to operate as expected and injured plaintiff.[58]  Plaintiffs further cite two printouts, one from social media in which a person claimed his "buddys dad got his finger stuck in a winch and it ripped it off"; and another from www.saferproducts.gov in which a person reported he lost two fingers from a different model of Badland Winch when he grabbed the hook and his hand was pulled through the rollers—he also specifically stated he had not contacted the manufacturer and did not plan to.  Def. App. 160-63.

Even with the credibility of Harbor Freight's declaration called into doubt, Plaintiffs have not submitted sufficient evidence for a jury to find that Harbor Freight designed the winch.  The Eighth Circuit held in *Merfeld v. Dometic Corp.* that the plaintiff offered insufficient evidence the defendant designed or manufactured a refrigerator (and specifically, its defective boiler tube) based on evidence that the defendant was the American distributor for the refrigerator's Swedish designer and manufacturer; the defendant issued a recall notice and a letter to purchasers in which it stated it

---

[56]  **Wilson v. Badland Winches**, No. 22-CV-455, Docs. 1, 1-1 (S.D. W. Va. Oct. 17, 2022); *see also* Def. App. 158.  Plaintiff apparently did not realize the lawsuits involved the same model and instead argues that the same defect in a different model of winch provided Harbor Freight with notice.  Harbor Freight appears to have committed a serious (and perhaps sanctionable) discovery violation, which I do not address at this time, as the parties do not raise the issue.

[57]  **Id.**, Docs. 30, 31 (Aug. 31, 2023).

[58]  **Miller v. Badland Winches**, No. 18-CV-26, Doc. 1-1 (S.D. W. Va. Jan. 8, 2018); *see also* Def. App. 156.

"manufactured and sold" the refrigerators in the United States; and the defendant's employee:

> identified North American safety standards for the [manufacturer's] design team in Sweden, reviewed sample refrigerators sent by [the manufacturer] to ensure they complied with those safety standards, and attended "aesthetic design meetings" in Sweden as an "observer" and addressed how aesthetic "inputs or requests" from [defendant's] North American customers "might affect any of the safety requirements."[59]

In *Anderson v. Kmart Corp.*, the Southern District of Iowa held that even though defendant's affidavit stating it did not design or manufacture the garden stake at issue lacked reliability and would be disregarded, plaintiffs' cited facts—that "packaging . . . said the garden stake had been made in China for [defendant]" and that opposing counsel acknowledged a "direct purchasing relationship between [defendant] and the Chinese manufacturer"—could not carry its burden of proof, even if the court could "speculate from these facts that [defendant] might have had some role in the design of the garden stake[] or ability to approve the design."[60] On the other hand, in *Allianz Global Corp. v. Watts Regulatory Co.*, the Southern District of Iowa held a jury could find defendant designed the defective plumbing part at issue based on evidence the Taiwanese company manufactured the part "at [defendant's] request with the understanding that the parts would be resold to [defendant's] customers"; defendant provided the manufacturer with exemplars of a similar product upon which to base the design; and deposition testimony suggested defendant reviewed and approved the design.[61]

Here, the statements in the owner's manual directing the purchaser to the Harbor Freight website is consistent with Harbor Freight's status as the trademark holder and distributor of the winch. Plaintiffs' best evidence is the statements on Harbor Freight's

---

[59] 940 F.3d at 1019, 1021-22.

[60] *Anderson*, 2014 WL 11514683, at *3.

[61] 2016 WL 4435094, at *1, *5.

22

website from 2020 suggesting that Harbor Freight designs the Badland Winches and tests their quality. But as Harbor Freight notes, Plaintiff purchased the winch at issue in 2019. Plaintiff has not offered evidence that the design of the winch, or Harbor Freight's and the manufacturer's relationship, remained unchanged from 2020 to years prior. Plaintiff offers no evidence at all on the design and manufacturing process for the winch, such as Harbor Freight providing specifications to the manufacturer or requiring approval for any changes to its design. The website statements here are akin to the recall notice in *Merfeld*, in which the distributor called itself the manufacturer, even though it was not. Plaintiffs bear the burden of proof, and though close, I do not find that they have created a submissible issue for the jury on whether Harbor Freight designed the winch.

Plaintiffs also argue that their evidence is sufficient to establish Harbor Freight is the "apparent manufacturer" of the winch. Although the "apparent manufacturer" doctrine may remain viable for claims not covered by the immunity statute (e.g., negligence claims), its application is inconsistent with the clear terms of § 613.18(1)(a). The immunity statute protects sellers who are not the "assembler, designer, or manufacturer" of the product from implied-warranty-of-merchantability claims based on design defects. The legislature did not exempt those who hold themselves out as manufacturers from immunity, despite Iowa law at the time of the statute's adoption recognizing the apparent-manufacturer doctrine.

In addition, even if Plaintiffs offered sufficient evidence Harbor Freight was the "apparent manufacturer" of the winch,[62] Plaintiffs have offered no evidence of reliance. In *Merfeld*, the Eighth Circuit recognized:

> The rationale for imposing liability on the apparent manufacturer is that a vendor who, through its labeling or advertising of a product, caused the public to believe that it was the manufacturer and to buy the product in

---

[62] *See* **Restatement (Third) § 14 cmt. d** (apparent-manufacturer doctrine applies to trademark holders who "participate substantially" in the distribution process).

reliance on the vendor's reputation and care in making it, is estopped to deny its identity as the manufacturer.[63]

Thus, the court held the apparent-manufacturer doctrine required proof "that the Plaintiffs believed or relied upon [the] brand name . . . in choosing the product."[64] Wilson did not state that he relied on the Badland Winch or Harbor Freight brand in purchasing the winch. *See* Pl. App. 6-8.

Harbor Freight is entitled to summary judgment on Plaintiffs' claim for breach of the implied warranty of merchantability based on statutory immunity.[65]

### B. Failure-to-Warn Claim

Harbor Freight argues it is entitled to summary judgment on Plaintiffs' failure-to-warn claim because it provided adequate warnings, Plaintiffs have not identified additional warnings that would have prevented the accident, and the danger was known and obvious.

Iowa has adopted the Restatement Third for failure-to-warn claims.[66]

Under the Restatement [Third § 2(c)], a product "is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of

---

[63] 940 F.3d at 1020 (cleaned up) (quoting *Hebel v. Sherman Equip.*, 442 N.W.2d 199, 201 (Ill. 1982)).

[64] *Id.* (cleaned up) (quoting *Sherman v. Sunsong Am., Inc.*, 485 F. Supp. 2d 1070, 1079-80 (D. Neb. 2007)); *see also* **Wagner**, 136 N.W.2d at 325 (noting evidence of reliance in applying apparent-manufacturer doctrine).

[65] I decline to address Harbor Freight's other arguments for dismissal of this claim.

[66] *Parish v. Jumpking, Inc.*, 719 N.W.2d 540, 543 (Iowa 2006).

24

the instructions or warnings renders the product not reasonably safe."[67]

A seller need not warn "regarding risks and risk-avoidance measures that should be obvious to, or generally known by, foreseeable product users."[68] When assessing the adequacy of warnings, the comments to the Restatement Third note:

> [C]ourts must be sensitive to many factors. It is impossible to identify anything approaching a perfect level of detail that should be communicated in product disclosures. For example, educated or experienced product users and consumers may benefit from inclusion of more information about the full spectrum of product risks, whereas less-educated or unskilled users may benefit from more concise warnings and instructions stressing only the most crucial risks and safe-handling practices. In some contexts, products intended for special categories of users, such as children, may require more vivid and unambiguous warnings. In some cases, excessive detail may detract from the ability of typical users and consumers to focus on the important aspects of the warnings, whereas in others reasonably full disclosure will be necessary to enable informed, efficient choices by product users. Product warnings and instructions can rarely communicate all potentially relevant information, and the ability of a plaintiff to imagine a hypothetical better warning in the aftermath of an accident does not establish that the warning actually accompanying the product was inadequate. No easy guideline exists for courts to adopt in assessing the adequacy of product warnings and instructions. In making their assessments, courts must focus on various factors, such as content and comprehensibility, intensity of expression, and the characteristics of expected user groups.[69]

---

[67] *Id.* at 545-46 (quoting **Restatement Third § 2(c)**); *accord* **Iowa Code § 668.12(4)** (providing that a seller is not liable for failure to warn if the "product bear[s] or [is] accompanied by a reasonable and visible warning or instruction," rendering it "reasonably safe for use if the warning or instruction is followed").

[68] **Iowa Code § 668.12(3)**; **Restatement Third § 2, cmt. j**; *accord Olson*, 522 N.W.2d at 291 ("There is no duty to warn where risks are known and obvious to the plaintiff.").

[69] **Restatement Third § 2, cmt. i**; *see also Specht v. Kubota Tractor Corp.*, No. 16-CV-1012-LRR, 2017 WL 2454319, at *10 (N.D. Iowa June 6, 2017) (citing several district court cases recognizing the factors in the last sentence of the Restatement excerpt).

25

Here, the owner's manual accompanying the winch specifically stated, "Do not place finger(s) through hook. Fingers may be caught and get pulled into fairlead or drum. Use included strap to hold hook instead." This instruction precisely addresses what happened here: Wilson had misplaced the strap going through the hook of the winch, so he used his fingers to hold the hook instead, and they got pulled into the fairlead. Wilson testified that he had read the owner's manual when he first purchased the winch—about a year and a half before the accident. Def. App. 52-53. He also indicated that before the day of the accident, he had used the safety strap to guide the hook with this and other winches. But he submitted a declaration stating he did not know he risked amputation by placing his fingers in the hook—and if he had known of this risk, he would not have placed his fingers through the hook to extend the cable. Pl. App. 7.

The warning from the owner's manual did not appear on the winch itself. The winch's motor contained a numbered list of eleven warnings, one of which said, "Keep hands and body away from cable intake when operating. Do not guide wire rope." Def. App. 206-07. Another numbered warning said, "Inspect before every use. Do not use if damaged or parts loose." *Id.* When asked if he had read this warning before use of the winch, Wilson responded, "[T]o my knowledge once you put the winch on you . . . physically can't see the winch," and this warning label is "physically on the winch." Def. App. 50.

Both the strap (which Wilson had misplaced) and the fairlead contained a picture of a hand holding the strap and the warning: "To prevent serious injury, keep hands clear. Guide hook using strap only when retracting cable." Def. App. 51, 96, 205. Plaintiff's expert opined the warning on the fairlead was defective because of the size of its font; its unclear wording; its placement on only one side of the fairlead; and its use of a "hazard avoidance symbol" (the picture of the hand grabbing the strap) rather than a "hazard description symbol" (such as a picture of a finger on the hook getting injured in

26

the roller).  Def. App. 208-09, 212.  As Plaintiffs' expert opined, the warning's wording could mean "you should use the strap" "only when you are retracting the cable," and not when extending the cable, as Wilson was doing when injured.  Pl. App. 209.  In addition, this warning appeared on only one side of the winch's fairlead, and it could be installed in such a manner that the warning was not visible (the owner's manual did not direct the winch be installed with the warning label facing out).[70]  Def. App. 206.  Plaintiffs' expert also opined that the font size of the warning on the fairlead was too small under standards set by the American National Standards Institute (ANSI).  Def. App. 207.  Plaintiffs' expert also noted ANSI recommends "hazard description symbols," which "depict the nature of the hazard" and "sometimes . . . show the consequences," rather than "hazard avoidance symbols," which "depict how to avoid the hazard," such as by showing what actions to take or not take or by conveying safety equipment information and location.  Def. App. 208.  He opined that warning, "To prevent serious injury, hold strap not hook," would be clearer and use fewer words, allowing the use of a larger font.  Def. App. 209.  Plaintiffs' expert testified at his deposition: "I don't know that changes to the warning would have necessarily prevented his accident.  I know what changes to the warnings can make the warnings more effective, which might have prevented the accident, but not which guaranteed would have."  Def. App. 312.

Harbor Freight argues that the provided warnings were adequate as a matter of law.  Iowa courts have held that a fact question may exist for the jury on whether the warning was inadequate if the warning did not appear on the product itself, even when

---

[70]  Neither party offers evidence on how the fairlead was installed at the time of the accident (with the warning visible or not).  The warning did not appear on the fairlead by the time of the defense expert examination.  Def. App. 343.  Wilson declared the warning on the fairlead was still attached on the day of the accident.  Pl. App. 7.  There is no information on when or how the warning label was removed.

27

an owner's manual warns of the precise danger at issue.[71] Iowa courts have held warnings adequate as a matter of law when they "expressly warn[] against using a product in a certain way and the consequence of doing so."[72] Here, because the warnings on the fairlead and motor housing of the winch are not overly specific, a jury could find them

---

[71] *See Lovick*, 588 N.W.2d at 691-92, 700 (sufficient evidence of causation for post-sale failure-to-warn claim even though owner's manual "warned against going under the wings to remove the pins," because machine itself did not contain this warning, even though by the time of the accident, defendant had received numerous reports of people being injured when standing underneath the wing and removing the pin); *Bandstra v. Int'l Harvester Co.*, 367 N.W.2d 282, 286 (Iowa Ct. App. 1985) (holding that when owner's manual advised of dangers of climbing a ladder over blower machinery, but machinery itself did not contain this warning, jury question existed on whether defendant's warning was inadequate because it did not appear on machinery itself).

[72] *Crow v. Manitex, Inc.*, 550 N.W.2d 175, 178-80 (Iowa Ct. App. 1996) (when both owner's manual and crane itself warned that the failure to place the pin into place would allow the boom to suddenly retract when raised and cause injury; and employees who placed pin indicated they spent fifteen to twenty minutes attempting to "pin it right" because they knew "if the wrong hole was pinned, a retraction . . . could occur . . . and injur[e] the person in the basket"; warnings were adequate as a matter of law); *see also Parish*, 719 N.W.2d at 542, 546-47 (when plaintiff became a quadriplegic doing a flip on a trampoline, holding that "a reasonable fact finder could not conclude that the [trampoline's] warnings were inadequate" when the owner's manual, pad of trampoline, and each outward facing leg of the trampoline all instructed not to do flips and warned of the risk of paralysis, "exceed[ing] the warnings required by" ANSI); *Johnson v. Harley-Davidson Motor Co. Grp.*, No. 03-0444, 2004 WL 370251, at *5 (Iowa Ct. App. Feb. 27, 2004) (holding defendant adequately warned of dangers of using motorcycle to pull trailer as a matter of law when the motorcycle contained a warning stating unstable handling and loss of control may occur from trailer towing, and the owner's manual said not to tow a trailer as they contributed to motorcycle instability and tire overload); **Restatement Third § 2, illus. 14** (garbage truck contained adequate warning stating "DANGER—DO NOT INSERT ANY OBJECT WHILE COMPACTION CHAMBER IS WORKING—KEEP HANDS AND FEET AWAY"; but noting plaintiff could still bring design-defect claim, as "[t]he possibility that an employee might lose his balance and thus encounter the shear point was a risk that a warning could not eliminate").

inadequate.[73]  A fact issue exists on whether the provided warnings were "reasonable and visible" and rendered the winch "reasonably safe if followed."

Harbor Freight argues Plaintiffs cannot prove causation, mostly relying on cases in which plaintiffs offered no expert testimony at all.  Here, Plaintiffs' expert testified that his proposed warning was "more effective" and though not guaranteed, "might have prevented the accident."  This testimony suggests "the foreseeable risks of harm posed by the product could have been reduced" by additional warnings.[74]  Causation also requires proof that the "particular user" would have changed behavior because of the warning.[75]  Here, Wilson declared that he would not have placed his fingers in the hook if he had understood doing so risked amputation.  His declaration, combined with his expert's opinion, creates a submissible jury issue on whether additional warnings would have prevented his accident.[76]

Harbor Freight also argues the dangers of placing one's fingers in the hook should have been obvious, especially to an experienced winch user like Wilson.  Examples of

---

[73] *See Mercer v. Pittway Corp.*, 616 N.W.2d 602, 624-26 (Iowa 2000) (jury question existed on adequacy of warning in owner's manual that smoke detector may not detect as many as 35% of all fires, when manual did not explain the difference in types of smoke detectors nor advise that this particular kind might detect a smoldering fire slower than another kind of smoke detector); **Restatement Third § 2, illus. 11** (jury question exists on reasonableness of warning on chemicals advising "that fumes from the adhesive were flammable and toxic, that the product should be used with adequate ventilation, and that all sources of fire should be extinguished," without specifically stating "that gas-stove pilot lights should be extinguished").

[74] **Restatement Third § 2.**

[75] *Miller v. Komatsu Forklift U.S.A., Inc.*, No. 4:04-cv-10408, 2006 WL 8436453, at *7 (S.D. Iowa Jan. 31, 2006) (citing **Restatement Third § 2, cmt. i**).

[76] *See Sec. Nat'l Bank of Sioux City, Iowa v. Abbott Lab'ys*, 947 F. Supp. 2d 979, 1000 (N.D. Iowa 2013) (holding that plaintiff offered sufficient evidence of causation based on affidavit that she would not have fed her newborn powdered infant formula if the label had stated "it was unsuitable for an infant under 28 days, that it may contain harmful bacteria, or that liquid formula was safer").

dangers that are known and obvious include using a ladder in front of a closed, unlocked door, which if opened, would strike the ladder;[77] or allowing a toddler to play with glass bottles that if dropped, could shatter and injure the toddler.[78] That placing one's fingers on the hook of the winch might result in one's fingers being pulled into the fairlead and mangled does not rise to the level of obviousness such that no warning was needed. Simply because Wilson was an experienced winch user does not render the risk here obvious.[79] It "cannot be said as a matter of law he understood the . . . gravity of the threatened harm."[80]

Harbor Freight is not entitled to summary judgment on plaintiff's failure-to-warn claim.

### C. Assumption-of-Risk Defense

Harbor Freight argues it is entitled to summary judgment on Plaintiffs' products-liability claims based on its assumption-of-risk defense. "[T]he affirmative defense of assumption of risk"—which acts as a complete bar to a plaintiff's claims—is not available "in cases in which the defendant c[an] . . . allege contributory negligence" (like with negligence claims); it is only available as a defense "in those cases in which contributory negligence [is] not available, such as strict liability."[81] Here, I have already found that

---

[77] **Restatement Third § 2, illus. 12**.

[78] *Henkel v. R & S Bottling Co.*, 323 N.W.2d 185, 187-89 (Iowa 1982).

[79] *See Olson*, 522 N.W.2d at 286, 291 (when the lid popped off of a drum containing chemicals and injured plaintiff's eye, rejecting defendant's argument that the risk was obvious as a matter of law "because [plaintiff] handled the drums frequently in the course of his employment").

[80] *Lovick*, 588 N.W.2d at 700.

[81] *Coker v. Abell-Howe Co.*, 491 N.W.2d 143, 147 (Iowa 1992).

Plaintiffs' products-liability claims for design defect and failure to warn sound in negligence, not strict liability, making an assumption-of-risk defense inapplicable.

The phrase "assumption of risk" may also be used as "an expression for the proposition that the defendant was not negligent, either because the defendant owed no duty or did not breach a duty."[82] To counter Plaintiffs' arguments that an assumption-of-risk defense does not apply to Plaintiffs' negligence claims, Harbor Freight invokes this other meaning of assumption of risk. Harbor Freight reiterates the arguments it made in connection with the failure-to-warn claim, stating Wilson knew of the risk of his hand being pulled into the fairlead roller based on the provided warnings and Wilson's status as an experienced winch user. I have already rejected this argument and found sufficient evidence for a jury to find Harbor Freight's warnings inadequate.[83] Accordingly, I find the alternative use of assumption of risk (that Harbor Freight owed no duty or did not breach any duty) does not apply here.

Harbor Freight is not entitled to summary judgment on Plaintiffs' design-defect and failure-to-warn claims based on assumption of risk.

### D. Express-Warranty Claim

Plaintiffs base their claim for breach of express warranty on the following provision in the owner's manual:

> **Limited 90 Day Warranty** Harbor Freight . . . makes every effort to assure that its products meet high quality and durability standards, and warrants to the original purchaser that this product is free from defects in materials and workmanship for the period of 90 days from the date of purchase.

---

[82] *Id.* at 146.

[83] Harbor Freight also raises an argument in its reply brief based on the "optional equipment doctrine," but I decline to address an argument first raised in reply that Plaintiffs did not have the opportunity to brief. *See Lauing v. Rapid City, Pierre & E. R.R.*, 610 F. Supp. 3d 1203, 1211 (D.S.D. 2022) (both district courts "and the Eighth Circuit usually decline to address arguments raised for the first time in a reply brief" based on waiver principles).

31

Harbor Freight argues that a warranty on "material and workmanship" warrants against manufacturing defects, not design defects. Harbor Freight also argues that the express warranty does not apply because the problem with the winch occurred more than ninety days from purchase.

Plaintiffs do not dispute that a warranty against "defects in material and workmanship" applies only to manufacturing defects.[84] Instead, Plaintiffs argue that Harbor Freight warranted against design defects by stating the winch met "high quality and durability standards." Under the Iowa Uniform Commercial Code (UCC), an express warranty includes "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods."[85] It need not contain "formal words such as 'warrant' or 'guarantee.'"[86] But "a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."[87] Thus, statements of fact are distinguished from "self-serving opinions, puffery on which no buyer would reasonably rely."[88] Courts have held (interpreting the identical language of other jurisdictions' UCCs) that a seller's statements about a product's "'high[ ]quality' [is a] value judgment[]

---

[84] *See Secura Ins. Co. v. Deere & Co.*, 101 F.4th 983, 987 (8th Cir. 2024) (applying Minnesota law and collecting cases from other jurisdictions holding that "warranties for defects in 'material or workmanship' do not include design defects in breach-of-warranty claims"); *Bruce Martin Constr., Inc. v. CTB, Inc.*, 735 F.3d 750, 753 (8th Cir. 2013) (applying Indiana law and collecting cases from other jurisdictions holding "where a product is manufactured correctly but designed inappropriately, the defect is one of design and not 'material or workmanship'").

[85] **Iowa Code § 554.2313(1)(a)**.

[86] **Iowa Code § 554.2313(2)**.

[87] *Id.*

[88] *Bush Truck Leasing, Inc. v. Cummins, Inc.*, No. 1:18-cv-871, 2020 WL 3871322, at *3 (S.D. Ohio July 9, 2020) (quoting *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 564 (6th Cir. 2013)) (applying Ohio law).

32

based upon the seller's opinion."[89]  Courts have also found statements about durability "to be non-actionable puffery."[90]  Thus, the statements in the owner manual did not create an express warranty.

In addition, the express-warranty claim is barred by the ninety-day limitation. Plaintiffs argue that the ninety-day limit applies only to the warranty on "material and workmanship," not to the statement about "high quality and durability standards."  But the quality-and-durability statement appears in the first half of a sentence concluding with the ninety-day limitation and after the heading "Limited 90 Day Warranty."

Harbor Freight is entitled to summary judgment on the express-warranty claim.

### E. Emotional-Distress Claim

Plaintiffs bring a claim for the infliction of emotional distress on Christine because she witnessed her husband's accident.  Iowa recognizes a derivative emotional-distress claim for bystanders who witness injuries caused by the defendant's negligence.[91]  To recover, the plaintiff must prove the following:

1. The bystander was located near the scene of the accident.
2. The emotional distress resulted from a direct emotional impact from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence.

---

[89]  *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prods. Inc.*, No. 2:02-cv-1288, 2007 WL 894833, at *21 (S.D. Ohio Mar. 22, 2007); *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 608-09 (D.N.J. 2016) (collecting cases).

[90]  *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-md-2359, 2018 WL 262826, at *16 (D. Minn. Jan. 2, 2018); *Tatum v. Chrysler Grp. LLC*, No. 10-cv-4269(DMC)(JAD), 2011 WL 1253847, at *4 (D.N.J. Mar. 28, 2011); *cf. Sharp v. Tamko Roofing Prods., Inc.*, No. 02-0728, 2004 WL 2579638, at *2 (Iowa Ct. App. Nov. 15, 2004) (when plaintiff claimed breach of express warranty based on statement that shingles were "durable," the court noted a seller's opinion should not be construed as a warranty, but ultimately held "[e]ven if the statements . . . created an express warranty," plaintiffs failed to show reliance).

[91]  *Clark v. Est. of Rice ex rel. Rice*, 653 N.W.2d 166, 170 (Iowa 2002).

3. The bystander and the victim were husband and wife or related within the second degree of consanguinity or affinity.
4. A reasonable person in the position of the bystander would believe, and the bystander did believe, that the direct victim of the accident would be seriously injured or killed.
5. The emotional distress to the bystander must be serious.[92]

Harbor Freight moves for summary judgment on two grounds: first, it argues that the claim fails because Christine did not actually see the moment when her husband lost his finger; and two, it argues that Christine's emotional distress does not rise to the requisite level of being serious.

### 1. Sensory and Contemporaneous Observance of the Accident Element

The first element at issue is whether Christine observed the accident contemporaneously and through her own perception. Christine testified to the following:

> We had went out for dinner and were on our way home, and our belt broke on the side-by-side [ATV]. So we had to pull off to the side of the highway, and we did that. Another couple that we knew pulled up at that time and we asked them to tow us. And I was gathering our stuff in the passenger seat, and [Wilson] was getting the winch out to hook it up to the truck. And I saw his hand go flying up, and I immediately said are you okay, and he said I am fine, like I am fine. And I seen his hand and I said no, you are not. And I grabbed our friend Tyler and asked Tyler to convince him to get in the truck, we needed to go to the hospital immediately. And from there we went straight to the hospital.

Christine did not see her husband's hand get pulled into the winch; rather, she saw his hand go flying up after he pulled his hand out of the rollers. Harbor Freight argues that because Christine did not see the act of her husband losing his finger in the winch, she did not have a "sensory and contemporaneous observance of the accident."

---

[92] **Id.** (quoting **Barnhill v. Davis**, 300 N.W.2d 104, 108 (Iowa 1981)).

34

The Iowa Supreme Court has found sufficient evidence to meet this element when the bystander saw his mother's car accident from his own vehicle—he was about three car lengths away from where the accident occurred, where he had stopped to wait for his mother to catch up to him.[93]  On the other hand, the court has rejected claims from relatives who arrive on the scene shortly after a car accident occurs, even if they are the first to render aid and witness the aftermath, because they did "not observe the accident" itself.[94]

In *Martin v. Crook*, the Iowa Court of Appeals held a jury issue existed on the contemporaneous-perception element for one of the plaintiffs.[95]  A husband was standing outside of the family minivan and was struck by a red car as his wife and children sat inside their minivan.[96]  His wife testified that in the minivan's rearview mirror, she saw a red car spinning in a circle with debris coming off it, and she thought she saw her husband running past the minivan, but later realized he had been "flying past" after being hit.[97]  Even though "she did not see the actual impact of [the red] car striking her husband," the court held there was sufficient evidence to meet the "sensory and contemporaneous" element.[98]  The court reasoned that the wife "was there; she saw part of the accident as it was occurring; and she saw her husband right after he had been

---

[93]  ***Barnhill***, 300 N.W.2d at 105, 108.

[94]  ***Moore v. Eckman***, 762 N.W.2d 459, 460, 462-63 (Iowa 2009).

[95]  No. 08-1711, 2009 WL 2392077, at *8 (Iowa Ct. App. Aug. 6, 2009).

[96]  ***Id.*** at *1-2.

[97]  ***Id.*** at *7.

[98]  ***Id.***

struck by the car."[99]   The court held the couple's children could not meet the contemporaneous-perception prong, however, because they had been watching a movie at the time of the accident and "did not notice that anything had happened until [their mother] exclaimed that [a] car had just crashed where [their father] was standing."[100]

Here, as with the wife in *Martin*, Christine's testimony of what she saw of the accident is sufficient to create a jury issue on the contemporaneous-perception element. Christine observed the accident as it occurred:  she saw her husband's hand fly up and the state of his hand thereafter, just as the wife in *Martin* saw her husband fly by her window and the state he was in thereafter.[101]   Christine's claim survives despite not seeing her husband's hand in the winch, just as the *Martin* wife's claim survived despite not seeing the moment the car hit her husband.   Harbor Freight's argument that Christine witnessed only the aftermath of the accident (by seeing her husband's hand fly up once he lost his finger in the winch) parses too finely what counts as the accident itself. Christine's testimony renders her more like the *Martin* wife who saw a portion of the accident, rather than the *Martin* children who were watching a movie and not paying

---

[99]  *Id.*  A federal district court has also held that a bystander need not witness the entire accident to meet the contemporaneous-perception prong under Iowa law, holding the evidence sufficient when the wife found her husband unconscious and pinned against a wall by farm equipment, reasoning that although not "present at the time [the] incident commence[d]," she "arrive[d] while it was still ongoing." *Chester v. Mustang Mfg. Co.*, 998 F. Supp. 1039, 1042, 1050 (N.D. Iowa 1998).

[100]  *Martin*, 2009 WL 2392077, at *8; *see also Baas v. Hoye*, 766 F.2d 1190, 1192, 11997 (8th Cir. 1985) (holding that father could not meet contemporaneous-perception element under Iowa law when his wife woke him up "screaming that [their young child] had gotten into the pills," he "sat on the edge of the bed while his wife took [the child] into the bathroom" to vomit, he held the child while his wife phoned for help, and then went back to bed until time to take the child to the doctor).

[101]  *See also* **Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 48 cmt. e & illus. 4** (Am. L. Inst. 2012) (noting that "[w]hile in most cases the [bystander] will see the events, the perception required . . . is not limited to sight," and providing example of "visually impaired" bystander who "hears the screeching of brakes, the impact of the car, and his daughter's screams").

attention. Defendants are not entitled to summary-judgment based on the sensory-and-contemporaneous element.

### 2. *Seriousness of Emotional Distress Element*

The other element at issue on Christine's emotional-distress claim is whether her emotional distress was serious. The only evidence Plaintiffs produced of Christine's emotional distress is a social-media direct message from five days after the accident in which Christine stated it "scared the shit out of" her when her husband's finger "started bleeding thr[ough] the gauze dressing and throbbing." Def. App. 176. Plaintiffs did not produce any medical or counseling records to show that Christine sought treatment for any physical manifestation of her alleged emotional distress. Neither did Plaintiffs identify any medical providers, therapists, or expert witnesses to testify about Christine's emotional distress. Indeed, Plaintiffs' initial disclosures do not identify any fact witnesses they intend to call at trial to discuss Christine's emotional distress—although Plaintiffs state Christine is listed as a witness and can testify to her emotional state. Plaintiffs do not provide a declaration from Christine or even any summary of what that testimony might be, however.[102]

---

[102] Plaintiffs argue that Defendants did not ask about Christine's emotional distress during depositions or discovery. But it is Plaintiffs, not Defendants, who bear the burden of proving their claim at trial.

> The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict. Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. . . . [T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery. . . . [T]he plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in his favor.

*Anderson*, 477 U.S. 242 at 256-57.

To succeed on a bystander emotional-distress claim, "the mental distress must be serious"; the law does "not compensate 'every minor psychic shock.'"[103] The Iowa Supreme Court has further stated: "While we recognize that mental distress may exist without objective physical symptoms, compensable mental distress should ordinarily be accompanied with physical manifestations of the distress."[104] I need not explore further what evidence is sufficient to meet this requirement—a single message that her husband's injury "scared the shit out of [her]" is insufficient evidence to prove serious emotional distress.

Accordingly, I grant summary judgment to Harbor Freight on Christine Wilsons's bystander emotional-distress claim.

### F. Loss-of-Consortium Claim

Harbor Freight argues it is entitled to summary judgment on Christine's loss-of-consortium claim because Wilson's direct claims all fail, and Christine's claim is a derivative claim. Since I have rejected Harbor Freight's arguments for summary judgment on Wilson's design-defect and failure-to-warn claims, Harbor Freight is not entitled to summary judgment on Christine's loss-of-consortium claim.

### G. Punitive Damages

Harbor Freight argues that there is insufficient evidence it acted willfully and wantonly, as necessary for punitive damages. An award of punitive damages requires

---

[103] *Barnhill*, 300 N.W.2d at 107 (quoting *D'Ambra v. United States*, 338 A.2d 524, 529 (R.I. 1975)).

[104] *Id.* at 107-08 (sufficient evidence of serious mental distress when plaintiff "claim[ed], and his doctor confirm[ed], that as a result of witnessing the accident he has experienced dizziness and pain in his legs and back"); *see also Martin*, 2009 WL 2392077, at *8 (sufficient evidence of serious mental distress when plaintiff "testified to severe headaches, nightmares, and forgetfulness following the accident"; consulted with medical providers regarding her memory problems and underwent a brain scan; and "was advised her problems were the result of stress rather than some other condition").

proof "by a preponderance of clear, convincing, and satisfactory evidence" that defendant's conduct "constituted willful and wanton disregard for the rights or safety of another."[105]

> [Punitive] damages are appropriate only when actual or legal malice is shown. Actual malice is characterized by such factors as personal spite, hatred, or ill will. Legal malice is shown by wrongful conduct committed or continued with a willful or reckless disregard for another's rights.[106]

"Mere negligent conduct is not sufficient to support a claim for punitive damages."[107] In the context of a product-defect case, to be liable for punitive damages, the defendant must have had "specific knowledge of a potential harm" and ignored that harm in a way that is "more egregious than mere negligence."[108]

Plaintiffs' only evidence that Harbor Freight acted willfully and wantonly is the evidence they argue supports Harbor Freight had a "reason to know" of the winch's design defect, discussed above: an online post in which a person commented that he knew someone who lost a finger using a winch; an online post in which a person complained of losing a finger using a Badland Winch, but specifically stated he did not inform or plan to inform Harbor Freight of the accident; and lawsuits from 2018 and 2022 involving similar claims as here against Harbor Freight. At most, this evidence establishes that Harbor Freight knew of one similar accident at the time it sold Wilson the winch at issue in 2019. This evidence is not sufficient to create a genuine dispute of material fact that Harbor Freight acted willfully and wantonly in selling the (allegedly defective) winch.

Plaintiffs are not entitled to punitive damages.

---

[105] **Iowa Code § 668A.1(1)(a)**.

[106] *McClure v. Walgreen Co.*, 613 N.W.2d 225, 230 (Iowa 2000) (citations omitted).

[107] *Id.*

[108] *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 79 (Iowa 2018).

39

### III. CONCLUSION

The court **GRANTS IN PART AND DENIES IN PART** Harbor Freight's motion for summary judgment (Doc. 30). Plaintiffs' claims for breach of express warranty, breach of implied warranty, infliction of emotional distress, and punitive damages are **dismissed with prejudice**. Plaintiffs' claims for design defect, failure to warn, and loss of consortium remain.

The court previously granted Harbor Freight's motion for a sixty-day trial continuance. Doc. 59. The court directed the parties to confer and notify chambers of availability for trial from November 2024 to February 2025 (which they have not yet done). *Id.* The court **ORDERS** that by **September 13, 2024**, the parties must file a joint notice estimating the length of trial and listing availability for trial in November and December 2024 and January and February 2025.

**SO ORDERED** on August 30, 2024.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

40